**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **MOSES IVERSON**, | CASE NO. 2:22-cv-00027 |
| 6131 Mapleton Drive<br>New Albany, Ohio 43054 | |
| and, | DISTRICT JUDGE |
| **DARREN KENDALL**, | MAGISTRATE JUDGE |
| 15604 Harvard Avenue<br>Cleveland, Ohio 44128 | |
| **PLAINTIFFS,** | **COMPLAINT WITH JURY DEMAND** |
| v. | |
| **CITY OF COLUMBUS**, | |
| C/O Zach Klein<br>Columbus City Attorney<br>77 North Front Street<br>Columbus, Ohio 43215 | |
| and, | |
| **NED PETTUS, JR.**, *in both official and individual capacities*, | |
| C/O Zach Klein<br>Columbus City Attorney<br>77 North Front Street<br>Columbus, Ohio 43215 | |
| and, | |
| **WILLIAM MARK GRAMLICH**, *in both official and individual capacities*, | |
| C/O Zach Klein<br>Columbus City Attorney<br>77 North Front Street<br>Columbus, Ohio 43215 | |

and,

**JACK ADKINS**, *in both official and individual capacities,*

C/O Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, Ohio 43215

and,

**MYKHAYLO RUSETSKY**, *in both official and individual capacities,*

C/O Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, Ohio 43215

and,

**NATHAN WILSON**, *in both official and individual capacities,*

C/O Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, Ohio 43215

and,

**DAN EDLESBERG**, *in both official and individual capacities,*

C/O Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, Ohio 43215

and,

**DAVID HAMON**, *in both official and individual capacities,*

C/O Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, Ohio 43215

**DEFENDANTS**.

## I.      NATURE OF THE CLAIMS

1.      Police officers in the City of Columbus are entrusted with an extraordinary amount of power.  They have the power to take lives, to save lives, to search and seize property, and to arrest individuals and deprive them of their liberty, among other powers.  As a result, they are expected to have good judgment and good character so that their powers are not abused.  For these reasons, the City of Columbus should have proper hiring standards that disqualify plainly unqualified police officer applicants.  But here, to put it plainly, the department's hiring practices have not met the standards the public deserves.  And perhaps this is one reason why the department continues to be sued for misconduct by the officers it chooses to hire.

2.      This lawsuit centers on Plaintiff Moses Iverson and Plaintiff Darren Kendall. They are two African American men who applied to be Columbus police officers but who were rejected.  The department rejected Mr. Iverson allegedly because (a) he was paying some back taxes and had a few accounts in collections that he was disputing and (b) he had a past accusation of an inappropriate comment in the workplace, although the alleged victim wrote him a letter of recommendation encouraging the department to hire him.  The department rejected Mr. Kendall allegedly because he had held several jobs in the last few years including one as a City of Columbus garbageman who was involved in two "minor traffic accidents."

3.      These reasons were a pretext for race discrimination.  These same, similar, or far more egregious issues did not stop the city from hiring Caucasian applicants who, quite frankly,

have no business being a police officer.  For instance, the department hired Caucasians who admitted to the following: (a) paying prostitutes for sex; (b) touching his father's girlfriend's vagina while she was asleep and without her consent; (c) statutory rape; (d) masturbating in a company vehicle at work; (e) engaging in sexual intercourse in the workplace; (f) using the illegal drugs of marijuana, cocaine, heroin, and MDMA and illegally abusing prescription painkillers; (g) driving under the influence; (h) engaging in bestiality by having their dogs lick their genitals to cause orgasms; (j) being accused of rape by a prior girlfriend; (k) having illegally used another's prescription Adderall; (l) having been sentenced to prison for theft; (m) having stolen money from an employer; (n) having stolen money from an employer's customers; and (o) having several jobs in the last few years including with one employer who fired him and "deemed him untrainable."

4.      When a police department hires Caucasians who have, as one applicant was described, "consistently showed a pattern of theft from places of work, drug usage, illegal sexual acts, and altercations with coworkers or supervisors," over two qualified African Americans, then there is something wrong.  Here, Mr. Iverson and Mr. Kendall were illegally denied employment as City of Columbus police officers because of their race.

5.      Accordingly, Plaintiffs now file this civil action.  They seek to recover for the harm they have suffered, to punish Defendants for their conduct, and to deter Defendants from ever perpetrating their conduct against any other African American.

## II.      JURISDICTION AND VENUE

6.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims made under federal law because those claims constitute a civil action arising under the Constitution, laws, or treaties of the United States.

7.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims made under state law because those claims are so related to the claims made under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Pursuant to Ohio Revised Code Sections 2307.381-.385, and the Due Process Clauses of the federal and Ohio Constitutions, this Court has personal jurisdiction over the defendants because they are residents of, and have continuous and systematic contacts with, the State of Ohio.

9.      Pursuant to 28 U.S.C. § 1391, this Court is the appropriate venue because the Southern District of Ohio is the judicial district in which a substantial part of the events or omissions giving rise to the claims for relief occurred.

10.     Pursuant to Rule 82.1 of the Local Civil Rules of the United States District Court for the Southern District of Ohio, the Eastern Division at Columbus is the appropriate division because it serves the counties in which a substantial part of the events or omissions giving rise to the claims for relief occurred.

### III.    PARTIES

11.     Plaintiff Moses Iverson ("Plaintiff Iverson" or "Mr. Iverson") is a natural person who is a resident of Franklin County, Ohio.  Mr. Iverson applied in 2019 to be a City of Columbus police officer but the city rejected his application in April of 2020.

12.     Plaintiff Darren Kendall ("Plaintiff Kendall" or "Mr. Kendall") is a natural person who is a resident of Cuyahoga County, Ohio.  Mr. Kendall applied in 2019 to be a City of Columbus police officer but the city rejected his application in April of 2020.

13. Defendant City of Columbus ("Defendant Columbus") is a municipal corporation located in Franklin County, Ohio. Its Division of Police is one of its departments tasked with providing safety services to the city.

14. Defendant Ned Pettus, Jr. ("Defendant Pettus") is a natural person who is a resident of Franklin County, Ohio. Defendant Pettus was, at all relevant times, the Public Safety Director for the City of Columbus. He was a decision-maker on whether Mr. Iverson and Mr. Kendall were hired as Columbus police officers.

15. Defendant William Mark Gramlich ("Defendant Gramlich") is a natural person who is a resident of Franklin County, Ohio. Defendant Gramlich was, at all relevant times, a Human Resources Analyst for the City of Columbus. He was a contributing decision-maker on whether Mr. Iverson and Mr. Kendall were hired as Columbus police officers.

16. Defendant Jack Adkins ("Defendant Adkins") is a natural person who is a resident of Franklin County, Ohio. Defendant Adkins was, at all relevant times, an employee of the City of Columbus. He was an Oral Board member for Mr. Iverson's and Mr. Kendall's 2019 applications to be Columbus police officers. He was also contributing decision-maker on whether Mr. Iverson and Mr. Kendall were hired as Columbus police officers.

17. Defendant Mykhaylo (Mike) Rusetsky ("Defendant Rusetsky") is a natural person who is a resident of Franklin County, Ohio. Defendant Rusetsky was, at all relevant times, an employee of the City of Columbus. He was an Oral Board member for Mr. Iverson's 2019 application to be a Columbus police officer. He was also contributing decision-maker on whether Mr. Iverson was hired as a Columbus police officer.

18. Defendant Nathan Wilson ("Defendant Wilson") is a natural person who is a resident of Franklin County, Ohio. Defendant Wilson was, at all relevant times, an employee of

the City of Columbus. He was an Oral Board member for Mr. Iverson's 2019 application to be a Columbus police officer. He was also contributing decision-maker on whether Mr. Iverson was hired as a Columbus police officer.

19.     Defendant Dan Edlesberg ("Defendant Edlesberg") is a natural person who is a resident of Franklin County, Ohio. Defendant Edlesberg was, at all relevant times, an employee of the City of Columbus. He was an Oral Board member for Mr. Kendall's 2019 application to be a Columbus police officer. He was also contributing decision-maker on whether Mr. Kendall was hired as a Columbus police officer.

20.     Defendant David Hamon ("Defendant Hamon") is a natural person who is a resident of Franklin County, Ohio. Defendant Hamon was, at all relevant times, an employee of the City of Columbus. He was an Oral Board member for Mr. Kendall's 2019 application to be a Columbus police officer. He was also contributing decision-maker on whether Mr. Kendall was hired as a Columbus police officer.

### IV. FACTS

#### A.     Plaintiffs' Race and Background

21.     Mr. Iverson is an African American man.

22.     Mr. Iverson is a veteran of the United States Army, serving from 1994 to 1997. He was honorably discharged.

23.     From 2009 to the present, Mr. Iverson has been employed as Medical Supply Technician at the U.S. Department of Veterans Affairs. His supervisor has rated his work performance as meeting or exceeding expectations.

24.     Mr. Iverson has had none of the following issues: (a) no incidents involving dishonesty or falsification; (b) no driver's license suspensions; (c) no gambling issues; (d) no

thefts or other criminal activity; (e) no improper or illegal sexual activity; and (f) no illegal substance abuse or abuse of legally prescribed drugs.

25.    Mr. Kendall is an African American man.

26.    Mr. Kendall currently works as an Uber and Lyft driver.

27.    Mr. Kendall has had none of the following issues: (a) no incidents involving dishonesty or falsification; (b) no driver's license suspensions; (c) no gambling issues; (d) no thefts or other criminal activity except for a ticket for disorderly conduct in 2002 or 2003 where he was attempting to break up a fight at Kent State University; (e) no improper or illegal sexual activity; and (f) no illegal substance abuse or abuse of legally prescribed drugs.

**B.    The Application Process to Become a City of Columbus Police Officer**

28.    The application process for the City of Columbus police department has several steps.  To start the process, a candidate must file a written application.  If the application is approved, the Civil Service Commission will notify the applicant of where to report for the four-phase entry-level police officer examination.  This four-phase examination consists of the following: (1) a multiple-choice test covering spelling, vocabulary, reading comprehension, and map reading; (2) a writing portion that tests oral comprehension and writing skills, as well as knowledge of spelling, grammar, punctuation, and capitalization; (3) an oral police exam called "COPE" designed to assess a candidate's problem-solving skills and interpersonal relations skills; and (4) a physical fitness test.  Candidates who pass all four phases are then rated by being placed in one of three bands (the 90, 80, or 70 bands) with veterans like Mr. Iverson supposedly being given a preference credit.

29.    Those candidates who pass all four phases must then give a personal history statement consisting of all sorts of background information.  They must then appear for a pre-

interview with a background investigator, where fingerprints are taken as well as photos of exposed tattoos.

30. Candidates are next subjected to a polygraph examination to verify the accuracy and completeness of all background information they provided.

31. The Civil Service Commission then reviews the collected material to determine if there are any violations of the City of Columbus Background Removal Standards for Police Officers and 911 Emergency Communications Employees (the "Background Removal Standards"). One standard, for instance, is "[a]ny theft offense within the last five (5) years, which singularly is equal to a felony."

32. The next step is for a background investigator to conduct a thorough check of the candidate's employment history, criminal record, and references. The background investigator will also conduct an interview of the candidate, which typically last for two to three hours.

33. All information collected by the department thus far in the application process is compiled and provided to an "Oral Review Board." The Oral Review Board consists of current police officers and can include a human resources employee. The Oral Review Board then interviews the candidate in person.

34. The recommendations of the Oral Review Board are then summarized and provided to the City of Columbus Safety Director for a final decision on whether to hire a candidate on a conditional appointment.

35. Candidates selected for conditional appointment are then required to undergo an additional background investigation, a second polygraph to address drug use questions, and then a medical examination to determine fitness.

36.     Finally, candidates selected for conditional appointment are notified of their date to start the Police Academy.  If they successfully complete the academy, they become City of Columbus police officers.

### C.     Plaintiffs Apply to Become Columbus Police Officers

37.     In 2019, Mr. Iverson and Mr. Kendall applied to become members of the 134th recruit class for the City of Columbus police department.

38.     They completed the written application and passed the four-phase examination. They then truthfully provided all requested background information.  They then successfully completed the polygraph examinations.

39.     Both Mr. Iverson and Mr. Kendall were ranked in the 90 band, which is the highest rating for those completing the initial part of the application process.

40.     Nothing in Mr. Iverson's or Mr. Kendall's respective backgrounds violated any of the Background Removal Standards.

41.     Mr. Iverson and Mr. Kendall also completed their interviews with a background investigator.

42.     Mr. Iverson was then interviewed by an Oral Review Board.  The members of his Oral Review Board were Defendant Adkins, Defendant Rusetsky, and Defendant Wilson.

43.     Mr. Kendall was likewise interviewed by an Oral Review Board.  The members of his Oral Review Board were Defendant Adkins, Defendant Edlesberg, and Defendant Hamon.

44.     The Oral Review Board interviews for both Mr. Iverson and Mr. Kendall were conducted in person and thus the Oral Review Board members could, and did, observe that Mr. Iverson and Mr. Kendall are African Americans.

45. The members of the Oral Review Boards for Mr. Iverson and Mr. Kendall both have regular on-the-job contact with Defendant Gramlich and Defendant Pettus.

46. Defendant Gramlich then summarized the recommendations of the Oral Review Board members for Mr. Iverson and Mr. Kendall, providing his own input. He then forwarded those summaries and input to Defendant Pettus.

47. Defendant Pettus made the final decision of whether to hire or not hire Mr. Iverson and Mr. Kendall.

**D.** **Plaintiffs Are Denied Employment as Columbus Police Officers**

48. On April 9, 2020, Defendants notified Mr. Iverson that they had rejected his application to become a member of the 134th recruit class for the City of Columbus police department. The rejection letter did not provide him any reasons. Mr. Iverson later learned that Defendants rejected him (a) because of his monthly financial obligations and (b) because of past accusations of inappropriate comments in the workplace.

49. Mr. Iverson's alleged issues with his financial obligations were benign. He owes back taxes under a payment plan where he pays around $500.00 per month. He has consistently met that payment plan. Aside from that obligation, like many other people living in the United States, he has a monthly rent payment, a monthly car payment, a monthly credit card payment, and a monthly student loan payment. Finally, Mr. Iverson has several credit accounts in collection, some of which he is disputing and others that he pays.

50. As for the accusation of past inappropriate comments in the workplace, that too was benign. In 2013, Mr. Iverson was accused of making an inappropriate comment to a female co-worker at the U.S. Department of Veterans Affairs. The accuser later wrote a letter of recommendation to the City of Columbus police department on Mr. Iverson's behalf, stating

among other things, "we have developed a great working relationship . . . [and] I can honestly say that I have absolutely no reservations about working with him, and around him, on a daily [basis]."

51.     On April 9, 2020, Defendants notified Mr. Kendall that they had rejected his application to become a member of the 134th recruit class for the City of Columbus police department.  The rejection letter did not provide him any reasons.  As a result, Mr. Kendall e-mailed Defendant Gramlich, who wrote back that he had been rejected because he had six jobs in the last two years, left one job without notice, and resigned from another job in lieu of termination.

52.     These claimed reason for Mr. Kendall were also benign.  To start, they were also wrong.  Mr. Kendall did not hold six jobs in the last two years, but rather four jobs.  Prior to that, Mr. Kendall had held continuous employment with the Greater Cleveland Regional Transit Authority ("GCRTA") from 2002 to 2017 (i.e., 15 years), before he lost his job due to a minor "cell phone policy" violation.  The job they say he left without notice was a seasonal snow removal job with the City of Cleveland.  Further, he had previously worked as a garbageman for the City of Columbus, but management asked him to resign in lieu of termination because he was involved in "two minor accidents."

**E.     Defendant Hires Demonstrably Unqualified Caucasians Over Plaintiffs**

53.     Ultimately, Defendants say they made 55 conditional offers to candidates for the 134th recruit class for the City of Columbus police department.  Of those, 39 (or 70.9%) were Caucasian.  Only 8 (or 14.54%) were African American.

54.     There were several Caucasian candidates who were offered employment as a City of Columbus police officer with the same, similar, or worse issues in their background.

55.     For the 134th recruit class, Defendants made a conditional offer to Joseph Vencill, a Caucasian.  His "areas of concern" included violence toward a supervisor, illegal sexual activity, theft including from an employer's customers, lying to the department's polygraphist, illegal use of a prescription drug, and being refused employment by two other law enforcement agencies.   Those problems were described in a summary of his polygraph examination as follows:

*In 2015, he was counseled after pushing a supervisor during a verbal altercation . . .*

*In 2002 or 2003, he self-reported that he touched his [father's] girlfriend's vagina while she was sleeping; in 2004/2005, he reported letting his dog lick peanut butter from his testicles. In 2009, he switched price tags on an item in the military post exchange, saving $30/$40 on the item.  While employed at Wendy's (2005-2007), he reported that he would short-change customers and keep the money.  While deployed overseas he paid a prostitute for sex on 5 or 6 occasion[s].  He paid a prostitute for sex in Columbus in 2011.  In 2015, he reported that he borrowed two prescription Adderall tablets from a friend in order to concentrate on a paper that he was writing.  He attempted to convince the polygraphist that he had a prescription for the drug, but ultimately admitted that the prescription had long since expired.  He has been turned down for hire by Dublin PD (2014) and the Franklin County Sheriff's Office (2015).*

*Mr. Vencill has many items of concern in this background and has continuously made bad decisions throughout his life up until recently.  He seemed to make excuses when questioned on his background, but told the board that was 'just his mindset at the time.'  He has consistently showed a pattern of theft from places of work, drug usage, illegal sexual acts, and altercations with coworkers or supervisors.*

But Defendants nevertheless hired him.

56.     For the 134th recruit class, Defendants made a conditional offer to Brandon Sipes II, a Caucasian.  His "areas of concern" including having multiple jobs in the past few years with three terminations, an inappropriate remark to a female co-worker, driving under the influence of alcohol multiple times, driving under the influence of marijuana multiple times, stealing money from an employer, getting naked in the shower with a woman too drunk to consent, viewing pornography while at work, illegal use of marijuana, snorting Percocet, and illegally using

another's Adderall. Those problems were described in a summary of his polygraph examination as follows:

> The applicant stated that he was fired from his position with Red Lobster in 2009 and also fired from his position with Dick's Sporting goods in 2010 for the same reason. He stated that at both he missed shifts and 'just stopped showing up.'

> The applicant stated that "they started investigating [his] call habits at the call center" when he worked for IKEA in 2017. He stated that he had been "calling a number that [he] knew wouldn't pickup" near the end of his shifts so as to not get stuck on a phone call. He stated that management deemed it to be 'call avoidance'. The applicant stated that he told them that he "doesn't need this" and was going to quit but "they just told [him] not to come back."

> The applicant stated that he was written up at his job with Aquatic Adventures in 2011 for making a remark to a co-worker "about her being high or something."

> The applicant admitted to driving under the influence of alcohol in the past, with the most recent occurrence being in "2015 or 2016."

> The applicant admitted to driving under the influence of marijuana in the past, with the most recent occurrence being in "2009 or 2010."

> The applicant admitted to stealing money from his position with 711 Parking in "2013 or 2014." He stated that he worked the later shift in a valet parking environment and "there was nowhere for customers to pay" at the time of day he worked, so he stated that customers would pay him their parking fees and he would "mix it into [his] tips." He estimated the total amount taken to be around $50.

> When asked if he has ever engaged in a sex act with someone unable to give consent, the applicant stated that he was in attendance at a party in 2009 and there 'was a girl there who was extremely drunk and throwing up on herself.' He stated that she was put into the shower and he climbed into the shower with her as well, stating that they were both naked as they 'both didn't have a change of clothes.' He would go on to say that 'there was no penetration, no oral, nothing like that.' He stated, 'But we were both naked, so like, my penis was touching her and I had my arms around her and stuff.' Asked if he had groped her or otherwise touched her inappropriately in any way, the applicant denied doing so. He stated that the girl's mother came to pick her up.

> The applicant admitted to viewing pornography on his cellphone while at work in the past, with the most recent occurrence being 'within the past year.'

> The applicant admitted to using marijuana in the past.

> The applicant stated that in '2009 or 2010' he 'crushed up and snorted' Percocet . . . .

14

*The applicant stated that he used Adderall that was prescribed to a friend . . . .*

But Defendants nevertheless hired him.

57.     For the 134th recruit class, Defendants made a conditional offer to Adam Robinson, a Caucasian.   His "areas of concern" included filing for bankruptcy, delinquent accounts turned over to collection agencies, repossession of his car and home, restraining orders filed against him by his ex-spouse, paying for a prostitute in Oklahoma, statutory rape, illegal use of marijuana, illegal use and distribution of Vicodin as a drug dealer, illegal use of Percocet, illegal use of OxyContin, illegal use of cocaine, illegal use of mushrooms, illegal use of LSD, illegal use of heroin, and deceptive answers.   Those problems were described in a summary of his polygraph examination as follows:

*As a result of a divorce in 2012, the applicant filed a Chapter 13 [bankruptcy] in Kentucky.*

*After moving to Ohio in 2014, the applicant was able to get the Chapter 13 bankruptcy dismissed whereupon he filed for – and was granted – a Chapter 7 bankruptcy.*

*As listed in his PHS, the applicant has had accounts turned over to collection agencies. These accounts included a movie rental and medical bills.*

*As listed in his PHS, after filing the 2012 bankruptcy, the applicant relinquished a vehicle and home to the lien holders.*

*In the PHS, the applicant listed his first wife on two occasions filed a restraining/protective order against the applicant.*

*As listed in his PHS, in 2005 the applicant visited a massage parlor in Lawton, Oklahoma. There, the applicant paid a masseuse $80.00 for oral sex.*

*The applicant admitted when he was sixteen years old he was having sex with his fourteen year old girlfriend.*

*The applicant admitted to using and buying marijuana.*

*The applicant admitted to using, buying, and selling Vicodin.*

*The applicant admitted to buying and using Percocet not prescribed to the applicant.*

15

*The applicant admitted to buying and using OxyContin not prescribed to him.*

*The applicant admitted to buying and using cocaine.*

*The applicant admitted to buying and using mushrooms.*

*The applicant admitted to buying and using LSD.*

*The applicant admitted to trying heroin in 2003.*

*After the exam, the applicant's reactions to the area of sex offenses and serious crimes were indicative of deception.*

But Defendants nevertheless hired him.

58.     For the 134th recruit class, Defendants made a conditional offer to Nathan Hanna, a Caucasian.  His "areas of concern" included terminations from prior employment and a job abandonment, being paid "under the table" and not reporting the income and thus avoiding taxes, possession of marijuana and drug paraphernalia, illegal use of marijuana, illegal use of another's prescription Adderall, exposing his penis at work and lying to the polygraph examiner about it, and being accused of rape by a girlfriend.  Those problems were described in a summary of his polygraph examination as follows:

*As listed in his PHS, the applicant was terminated from Playground World for not properly inspecting the work of a subordinate; a customer complained of the work and the applicant was held accountable.*

*At Dockers Restaurant – one of applicant's 'under-the-table' jobs – the applicant stopped reporting for his shifts; the applicant assumes he was fired.*

*On two occasions, while at Bowling Green State University, the applicant was charged with possession of marijuana and drug paraphernalia . . . .*

*Initially when asked if he had ever masturbated in a public place or at work, the applicant stated, 'No.'  However, just prior to the test being administered, the applicant asked if 'adjusting' himself equated to masturbation . . . .*

*As noted in his PHS, the applicant used and purchased marijuana.*

16

*When the applicant was in high school, the applicant's mother gave him one of her friend's prescription Adderall.*

*After the polygraph examination, scrutiny of the applicant's chart tracings revealed that his responses to the sex offenses question were indicative of deception. The applicant was informed of this examiner's opinion and asked for an explanation. The applicant stated one of the instances of where he 'adjusted' himself in his car, he did pull out his penis from his pants. The applicant stated he did so not for sexual gratification, but again, just to 'adjust' himself. The applicant then went on to say there were times when he put his hands in his pants to 'adjust' himself but on this particular occasion a few months ago he fully exposed himself.*

*Just being before dismissed, the applicant comments there had been a time when he was a sophomore and had sex with a girl. The applicant said 'afterwards' the girl used words to the effect the applicant had raped her. The applicant denied raping the girl, said the sex was consensual, and that the girl had initiated the sex. Asked why the girl would make such an accusation, the applicant stated he did not know and the occasion was the only time the applicant's 'name was associated with the word rape.'*

*On February 11, 2020, Nathan Hanna appeared for a polygraph examination to address areas of concern that arose from initial pre-employment polygraph . . . Mr. Hanna's reactions to questions pertaining to 'Sex Offenses' exhibited significant responses to that particular issue.*

*Asked if he had ever masturbated in a public place or at work, Mr. Hanna said he wanted to clarify what he had stated in his previous polygraph. In his previous polygraph, Mr. Hanna said he 'adjusted' himself, even on one occasion fully exposing his penis; he denied this was masturbation for sexual purposes.*

*Today Mr. Hanna stated his actions probably were masturbation, but not for sexual gratification. He went on to explain at no time did he ejaculate; thus his reasoning in his previously polygraph that his actions were not masturbation.*

*Mr. Hanna agreed it was fair to say he had masturbated in his vehicle.*

But Defendants nevertheless hired him.

59.    For the 134th recruit class, Defendants made a conditional offer to Dakota Freeman, a Caucasian. His "areas of concern" included a delinquent account going to collections, stealing a television from Walmart for which he was found guilty of theft and had to serve jail time, and having sex after hours in the workplace. Those problems were described in a summary of his polygraph examination as follows:

17

*The applicant stated that he had a medical bill go to collections in 2014 that has since been resolved.*

*The applicant stated that he was caught stealing a television from Walmart in 2013. He stated that he 'got caught up with the wrong people' and that he 'was trying to impress friends." He stated the television was valued at $250. He had to pay a fine, was put on one year of probation, and sentenced to 98 days in jail, of which he had to serve two days.*

*The applicant stated that in 2015 he and his girlfriend engaged in sexual intercourse at his place of employment after hours.*

But Defendants nevertheless hired him.

60.    For the 134th recruit class, Defendants made a conditional offer to David Achille, a Caucasian. His "areas of concern" included being terminated from a job after his employer "deemed [him] untrainable," being sent to collections on unpaid student loans, dropping out of the U.S. Navy after only two or three weeks, and illegal use of marijuana. Those problems were described in a summary of his polygraph examination as follows:

*The applicant stated that he was terminated from his position with Kindercare in September of 2018 . . . The applicant stated that they 'deemed [him] untrainable' as a result and let him go.*

*The applicant stated that he was just recently notified of a $3000 student loan balance in collections. He is in the process of disputing that balance.*

*The applicant stated that he enlisted in the United States Navy when he was 19 years old but 'dropped out after like two or three weeks.'*

*The applicant admitted to using marijuana on one occasion ever, which occurred in 2004.*

But Defendants nevertheless hired him.

61.    For the 134th recruit class, Defendants made a conditional offer to Courtney Wilburn, a Caucasian. Her "areas of concern" included seven traffic tickets and two accidents, driving on multiple occasions while impaired, masturbating in a tanning bed, attempting to have the family dog perform "cunnilingus" on her while nine years' old, illegal use of marijuana,

stealing prescription painkillers from her grandfather, and illegal use of "whippets." Those

problems were described in a summary of her polygraph examination as follows:

*The applicant estimated she has received seven tickets in her lifetime.*

*The applicant has been involved in two accidents.*

*The applicant has driven on multiple occasions while impaired; however, the most recent time the applicant has done so was when she was twenty-one years old.*

*In 2014 the applicant masturbated in a tanning bed; she is certain no one saw her.*

*The applicant stated as a nine year old – and not at the age of thirteen as noted in her previous polygraph – the applicant tried to have the family dog perform cunnilingus on her. The applicant said she got the idea after seeing a video of such an act.*

*As noted in her PHS, the applicant used and purchased marijuana.*

*As detailed in her 2010 polygraph, the sixteen or seventeen year old applicant stole prescription medication from her grandfather. Among the medications the applicant stole: OxyContin, Vicodin, Darvocet.*

*The applicant stated the thefts of her grandfather's medication actually occurred in 2007 and not 2009 as noted in her 2010 polygraph.*

*Whippets – As a fourteen year old, the applicant huffed whippets.*

*It was noted the applicant took her polygraph in 2010; but the applicant noted in her PHS that the most recent time she had used drugs was in January 2011. The applicant confirmed she did use drugs on occasion after her 2010 police application and polygraph.*

But Defendants nevertheless hired her.

### F. Plaintiffs File Charges of Discrimination

62. On October 6, 2020, Mr. Iverson dual-filed a charge of discrimination with the

Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission

("EEOC"). He alleged Defendant Columbus committed race discrimination by refusing to hire

him in April of 2020. His charge alleged the similar set of facts described in this Complaint.

63.     On October 5, 2020, Mr. Kendall dual-filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC").  He alleged Defendant Columbus committed race discrimination by refusing to hire him in April of 2020.  His charge alleged the similar set of facts described in this Complaint.

### G.    The Right-To-Sue Letters

64.     On October 7, 2021, the EEOC issued a "Dismissal and Notice of Rights" letter to Mr. Iverson for his charge of discrimination (the "Iverson Right-to-Sue Letter").

65.     A true and accurate copy of the Iverson Right-to-Sue Letter is attached as Exhibit 1 to this Complaint.

66.     On October 7, 2021, the EEOC issued a "Dismissal and Notice of Rights" letter to Mr. Kendall for his charge of discrimination (the "Kendall Right-to-Sue Letter").

67.     A true and accurate copy of the Kendall Right-to-Sue Letter is attached as Exhibit 2 to this Complaint.

### V.    CLAIMS FOR RELIEF

### COUNT I

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.**
**(Race Discrimination – Failure to Hire)**

**By Plaintiff Iverson Against Defendant Columbus**

68.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

69.     Plaintiff Iverson was at all relevant times an "employee" within the meaning of 42 U.S.C. § 2000e(f).

70.     Defendant Columbus was at all relevant times an "employer" within the meaning of 42 U.S.C. § 2000e(b).

71.     Defendant Columbus violated 42 U.S.C. § 2000e-2(a) when it refused to hire Plaintiff Iverson because of his race.  Alternatively, Plaintiff Iverson's race was a motivating factor in the decision by Defendant Columbus to not hire him.

72.     As a proximate result of Defendant Columbus's actions, Plaintiff Iverson has been and continues to be damaged in an amount to be determined at trial.

73.     Consistent with 42 U.S.C. § 1981a, Plaintiff Iverson is entitled to punitive damages because Defendant Columbus engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to Plaintiff Iverson's federally protected rights.

74.     Consistent with 42 U.S.C. § 2000e-5(k), Plaintiff Iverson is entitled to reasonable attorneys' fees incurred in pursuing Count I.

## COUNT II

### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. (Race Discrimination – Failure to Hire)

### By Plaintiff Kendall Against Defendant Columbus

75.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

76.     Plaintiff Kendall was at all relevant times an "employee" within the meaning of 42 U.S.C. § 2000e(f).

77.     Defendant Columbus was at all relevant times an "employer" within the meaning of 42 U.S.C. § 2000e(b).

78.     Defendant Columbus violated 42 U.S.C. § 2000e-2(a) when it refused to hire Plaintiff Kendall because of his race.  Alternatively, Plaintiff Kendall's race was a motivating factor in the decision by Defendant Columbus to not hire him.

79.     As a proximate result of Defendant Columbus's actions, Plaintiff Kendall has been and continues to be damaged in an amount to be determined at trial.

80.     Consistent with 42 U.S.C. § 1981a, Plaintiff Kendall is entitled to punitive damages because Defendant Columbus engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to Plaintiff Kendall's federally protected rights.

81.     Consistent with 42 U.S.C. § 2000e-5(k), Plaintiff Kendall is entitled to reasonable attorneys' fees incurred in pursuing Count II.

### COUNT III

**Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983**
**Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**
**(Race Discrimination – Failure to Hire)**

**By Plaintiff Iverson Against**
**Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson**

82.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

83.     Plaintiff Iverson was at all relevant times a "citizen of the United States or other person within the jurisdiction thereof" within the meaning of 42 U.S.C. § 1983.

84.     Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson were, at all relevant times, "person[s]" within the meaning of 42 U.S.C. § 1983 because they are sued for prospective injunctive relief in their official capacities and for money damages in their individual capacities.

85.     Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson acted under color of a statute, ordinance, regulation, custom, or usage of the State of Ohio and deprived Plaintiff Iverson of his rights, privileges, or immunities secured by the federal Constitution or federal law

when they refused to hire him because of his race. Alternatively, Plaintiff Iverson's race was a motivating factor in their decision to refuse to hire him.

86.     As a proximate result of Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson's actions, Plaintiff Iverson has been and continues to be damaged in an amount to be determined at trial.

87.     Plaintiff Iverson is entitled to punitive damages because Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson were motivated by evil motive or intent or acted with reckless or callous indifference to Plaintiff Iverson's federally protected rights.

88.     Consistent with 42 U.S.C. § 1988, Plaintiff Iverson is entitled to reasonable attorneys' fees incurred in pursuing Count III.

**COUNT IV**

**Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983**
**Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**
**(Race Discrimination – Failure to Hire)**

**By Plaintiff Kendall Against**
**Defendants Pettus, Gramlich, Adkins, Edlesberg, and Hamon**

89.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

90.     Plaintiff Kendall was at all relevant times a "citizen of the United States or other person within the jurisdiction thereof" within the meaning of 42 U.S.C. § 1983.

91.     Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson were, at all relevant times, "person[s]" within the meaning of 42 U.S.C. § 1983 because they are sued for prospective injunctive relief in their official capacities and for money damages in their individual capacities.

92.     Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson acted under color of a statute, ordinance, regulation, custom, or usage of the State of Ohio and deprived Plaintiff

Kendall of his rights, privileges, or immunities secured by the federal Constitution or federal law when they refused to hire him because of his race.  Alternatively, Plaintiff Kendall's race was a motivating factor in their decision to refuse to hire him.

93.     As a proximate result of Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson's actions, Plaintiff Kendall has been and continues to be damaged in an amount to be determined at trial.

94.     Plaintiff Kendall is entitled to punitive damages because Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson were motivated by evil motive or intent or acted with reckless or callous indifference to Plaintiff Kendall's federally protected rights.

95.     Consistent with 42 U.S.C. § 1988, Plaintiff Kendall is entitled to reasonable attorneys' fees incurred in pursuing Count IV.

## COUNT V

### Violation of Ohio Revised Code Sections 4112.02 and/or 4112.99
### (Race Discrimination – Failure to Hire)

### By Plaintiff Iverson Against Defendant Columbus

96.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

97.     Plaintiff Iverson was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

98.     Defendant Columbus was at all relevant times an "employer" within the meaning of Ohio Revised Code Section 4112.01(A)(2).

99.     Defendant Columbus violated Ohio Revised Code Sections 4112.02 and/or 4112.99 when it refused to hire Plaintiff Iverson because of his race.  Alternatively, Plaintiff Iverson's race was a motivating factor in the decision by Defendant Columbus to not hire him.

24

100.    As a proximate result of Defendant Columbus's actions, Plaintiff Iverson has been and continues to be damaged in an amount to be determined at trial.

## COUNT VI

### Violation of Ohio Revised Code Sections 4112.02 and/or 4112.99
### (Race Discrimination – Failure to Hire)

### By Plaintiff Kendall Against Defendant Columbus

101.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

102.    Plaintiff Kendall was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

103.    Defendant Columbus was at all relevant times an "employer" within the meaning of Ohio Revised Code Section 4112.01(A)(2).

104.    Defendant Columbus violated Ohio Revised Code Sections 4112.02 and/or 4112.99 when it refused to hire Plaintiff Kendall because of his race.  Alternatively, Plaintiff Kendall's race was a motivating factor in the decision by Defendant Columbus to not hire him.

105.    As a proximate result of Defendant Columbus's actions, Plaintiff Kendall has been and continues to be damaged in an amount to be determined at trial.

## COUNT VII

### Violation of Ohio Revised Code Sections 4112.02(J) and/or 4112.99
### (Aiding and Abetting Unlawful Discrimination)

### By Plaintiff Iverson Against
### Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson

106.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

107. Plaintiff Iverson was at all relevant times an "employee" within the meaning of Ohio Revised Code Section. 4112.01(A)(3).

108. Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson were at all relevant times "person[s]" within the meaning of Ohio Revised Code Section 4112.01(A)(1).

109. Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson violated Ohio Revised Code Sections 4112.02(J) and/or 4112.99 when they aided, abetted, incited, compelled, or coerced the unlawful discrimination against Plaintiff Iverson set forth in this Complaint.

110. As a proximate result of Defendants Pettus, Gramlich, Adkins, Rusetsky, and Wilson's actions, Plaintiff Iverson has been and continues to be damaged in an amount to be determined at trial.

## COUNT VIII

### Violation of Ohio Revised Code Sections 4112.02(J) and/or 4112.99
### (Aiding and Abetting Unlawful Discrimination)

### By Plaintiff Kendall Against
### Defendants Pettus, Gramlich, Adkins, Edlesberg, and Hamon

111. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

112. Plaintiff Kendall was at all relevant times an "employee" within the meaning of Ohio Revised Code Section. 4112.01(A)(3).

113. Defendants Pettus, Gramlich, Adkins, Edlesberg, and Hamon were at all relevant times "person[s]" within the meaning of Ohio Revised Code Section 4112.01(A)(1).

114. Defendants Pettus, Gramlich, Adkins, Edlesberg, and Hamon violated Ohio Revised Code Sections 4112.02(J) and/or 4112.99 when they aided, abetted, incited, compelled, or coerced the unlawful discrimination against Plaintiff Kendall set forth in this Complaint.

26

115.    As a proximate result of Defendants Pettus, Gramlich, Adkins, Edlesberg, and Hamon's actions, Plaintiff Kendall has been and continues to be damaged in an amount to be determined at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment in their favor on all claims in this Complaint and request the following relief:

A.    Economic compensatory damages in an amount to be determined at trial;

B.    Non-economic compensatory damages in an amount to be determined at trial;

C.    Liquidated, treble, punitive, or other exemplary damages in an amount to be determined at trial;

D.    Reinstatement or, in the alternative, front pay in an amount to be determined;

E.    Reasonable attorneys' fees incurred in pursuing the claims against Defendants;

F.    All costs and expenses incurred in pursuing the claims against Defendants;

G.    Pre- and post-judgment interest; and

H.    All other legal and equitable relief this Court and/or a jury determines is appropriate.

## VII.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all claims and issues that are triable.

Respectfully submitted,

By:  /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)
Kevin R. Kelleher (Ohio Bar No. 0099167)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 200
Hilliard, Ohio 43026

Telephone: (614) 586-7915
Facsimile: (614) 586-7901
jstarling@willisattorneys.com
kkelleher@willisattorneys.com

John C. Camillus (Ohio Bar No. 0077435), Trial Attorney
LAW OFFICES OF JOHN C. CAMILLUS, LLC
P.O. Box 141410
Columbus, Ohio 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
jcamillus@camilluslaw.com

*Attorneys for Plaintiffs Moses Iverson and Darren Kendall*